IN THE UNITED STATES DISTRCT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.:  1:19-cv-21725-JLK

JAVIER GARCIA-BENGOCHEA,

       Plaintiff,

v.

CARNIVAL CORPORATION d/b/a
CARNIVAL CRUISE LINE,

       Defendant.

## MOTION OF FORMER CONGRESSMEN DAN BURTON AND ROBERT TORRICELLI FOR LEAVE TO FILE *AMICUS CURIAE* BRIEF IN SUPPORT OF PLAINTIFF AND SUPPORTING MEMORANDUM OF LAW

Dan Burton and Robert Torricelli, former Members of the United States Congress, hereby move, pursuant to Rule 7.1 of the Local Rules of the U.S. District Court for the Southern District of Florida, to file an *Amicus Curiae* Brief in support of the Plaintiff's Opposition to the Defendant Carnival's Motion for Judgment on the Pleadings.[1]  Mr. Burton is a former Republican Member of the U.S. House of Representatives, and was the lead House co-sponsor of the Helms-Burton law, also known as the Cuban Liberty and Democratic Solidarity (Libertad) Act of 1996 ("Helms-Burton Act").   He was also the Chairman of the Western Hemisphere Subcommittee of the House Committee on International Relations at the time the law was enacted.  Mr. Torricelli is a former Democratic Member of the House and

---

[1]   If accepted, *Amici* request that their brief be considered for any other future matter involving the issues addressed therein.

U.S. Senate, who was an original co-sponsor and floor leader for the Helms-Burton Act in the House in 1995-96.   *Amici* have unique insights and perspectives that will aid the Court in interpreting the statute and discerning Congressional intent with respect to the defense argument that the Plaintiff cannot pursue his claim under Title III because he inherited it after March 12, 1996.  The proposed *Amicus Curiae* Brief is attached as Exhibit A.

### MEMORANDUM OF LAW

A.   **District Courts Have Inherent Authority to Allow Participation of *Amici* Who Have Unique Interests and Perspectives in Issues Being Litigated.**

District courts possess the inherent authority to accept *amicus* briefs.  *In re Bayshore Ford Truck Sales, Inc.*, 471 F.3d 1233, 1249 n.34 (11th Cir. 2006) ("[D]istrict courts possess the inherent authority to appoint 'friends of the court' to assist in their proceedings."); *Resort Timeshare Resales, Inc. v. Stuart*, 764 F. Supp. 1495, 1500 (S.D. Fla. 1991) ("The district court has the inherent authority to appoint *amici curiae*, or 'friends of the court,' to assist it in a proceeding."); *Jin v. Ministry of State Security*, 557 F. Supp. 2d 131, 136 (D.D.C. 2008) ("district courts have inherent authority to appoint or deny amici which is derived from Rule 29 of the Federal Rules of Appellate Procedure"); *United States v. Davis,* 180 F. Supp. 2d 797, 800 (E.D. La. 2001) (noting that district courts have authority to permit the filing of amicus briefs).

The standard for leave to file an *amicus* brief is whether it will assist the Court in deciding the issues before it. *Neonatology Assocs., P.A. v. C.I.R.*, 293 F.3d

128, 133 (3d Cir. 2002) (Alito, J) ("[I]f a good brief is rejected, the merits panel will be deprived of a resource that might have been of assistance."); *Ryan v. Commodity Futures Trading Comm'n*, 125 F.3d 1062, 1064 (7th Cir. 1997) ("An amicus brief should normally be allowed . . . when the amicus has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide."); *Friends of the Everglades, Inc., v. South Florida Water Management District*, 2005 WL 8160352 (S.D. Fla. Nov. 1, 2005) (allowing *amicus* participation by advocacy groups concerned with water rights from the western section of the United States who argued a decision could have wide-ranging effects given the special geographic and meteorological characteristics of the western United States were "uniquely interested in the outcome of this litigation and uniquely positioned to inform the Court" about the issues); *United States v. UBS, AG*, 2009 WL 10669118 (S.D. Fla. May 19, 2009) (international bankers associations granted leave to file *amicus* brief where "the movants have adequately demonstrated their interest in this case and that their brief would be of assistance to this Court.").

**B.**  ***Amici's* Leadership Roles in Authoring, Sponsoring, and Working to Pass the Helms-Burton Law as Members of the U.S. House of Representatives Give Them a Unique Interest and Perspective on the Issues Before the Court.**

As thoroughly discussed in the proposed *Amicus Curiae* Brief attached as Exhibit A, it is the position of the *Amici* that the text, context, and history of the Helms-Burton Law clearly support the Plaintiff's position, i.e. that Congress intended that heirs should enjoy the right to sue under Title III even if they

inherited their claims after March 12, 1996.  Nothing in the text of the law supports the opposite conclusion.  Further, as the legislative findings provide, the main purposes of the law were to compensate Americans whose property was confiscated by the Castro Regime, and to prevent businesses from profiting from trafficking in American nationals' confiscated properties, and prevent the Cuban government from using confiscated properties to bolster the regime's finances.  With some 85% of all certified claims now owned by individuals who inherited their claims from relatives whose property was confiscated prior to March 12, 1996, a decision barring those claimants from being able to make claims under Title III would effectively render the law meaningless.

*Amici,* along with Representatives and Senators of both parties, labored extensively for years to author and enact an enforceable cause of action and have a special interest in seeing that Title III is not effectively read out of existence by the interpretation advanced by Carnival.

WHEREFORE, proposed *Amici Curiae* Dan Burton and Robert Torricelli respectfully move for entry of an Order accepting Exhibit A as an *Amicus Curiae* Brief in this case.

### Certificate of Compliance with Local Rule 7.1(a)(3)

The undersigned hereby certifies that he conferred with Stuart Singer, Esquire, Counsel for Defendant Carnival, and Roberto Martinez, Esquire, counsel for Plaintiff Javier Garcia-Bengochea, to obtain their consent to the relief requested

in this Motion.   Mr. Martinez not object on behalf of the Plaintiff.   Mr. Singer advised that Carnival opposes the motion.

Dated:  February 24, 2020                          Respectfully submitted,

DUBBIN & KRAVETZ, LLP
Samuel J. Dubbin, P.A.
1200 Anastasia Avenue, Suite 300
Coral Gables, Florida 33134
Telephone: (305) 357-9004
Email: sdubbin@dubbinkravetz.com

By: _____
Samuel J. Dubbin, P.A.
Fla. Bar No. 328189

Attorneys for *Amici Curiae* Dan Burton and Robert Menendez

### CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2020, I filed the foregoing document with the CM/ECF system which will serve all counsel of record in this case.

By: _____
Samuel J. Dubbin, P.A.

# EXHIBIT A

IN THE UNITED STATES DISTRCT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.:  1:19-cv-21725-JLK

JAVIER GARCIA-BENGOCHEA,

        Plaintiff,

v.

CARNIVAL CORPORATION d/b/a
CARNIVAL CRUISE LINE,

        Defendant.

**BRIEF OF FORMER CONGRESSMEN
DAN BURTON AND ROBERT TORRICELLI
<u>AS AMICI CURIAE</u>**

**INTEREST OF *AMICI CURIAE***

*Amici* are former Republican U.S. Representative Dan Burton and former Democratic U.S. Representative and Senator Robert Torricelli (together, "Members of Congress").  As Members of Congress, they played key roles in the creation and enactment of the Helms-Burton Act, also known as the Cuban Liberty and Democratic Solidarity (Libertad) Act of 1996 ("Helms-Burton Act" or "LIBERTAD Act"), and have a unique interest in the proper application of federal laws, including the Helms-Burton Act.

Former Rep. Burton represented Indianapolis, Indiana, in the U.S. House of Representatives between 1983 and 2013, including on the Committee on International Affairs (now the Foreign Affairs Committee) and as Chairman or

Ranking Member of the Committee on Oversight and Government Reform. Representative Burton was the prime House sponsor of the Helms-Burton Act, as the title of the Act reflects, and was the Chairman of the Subcommittee on the Western Hemisphere of the House Committee on International Relations at the time of the Helms-Burton Act. Former Senator Torricelli served as a member of the U.S. House of Representatives from New Jersey's 9th district from 1983 to 1997 and as a United States Senator from New Jersey from 1997 to 2003, and was an original co-sponsor of the Helms-Burton Act and served as a floor leader in the passage of the legislation in the full House of Representatives.[1]

*Amici* are submitting this brief to offer the Court their unique perspectives about the substantive provisions of the Helms-Burton Act and the context of the legislation, concerning the right of a U.S. national who inherited certified and uncertified claims after March 12, 1996, to bring a claim under Title III against traffickers of their relatives' confiscated Cuban properties. Contrary to the arguments made by defendants in several lawsuits brought by the heirs of claim owners, there is no question that Congress intended that heirs should enjoy the right to sue under Title III even if they inherited their claims after March 12, 1996. Any other interpretation would render the law meaningless, a result that would

---

[1]    *Amici* and their House and Senate colleagues expended considerable time, energy, and political capital in creating and advocating for the legislation, including persuading a majority of their colleagues in both parties, as well as President Bill Clinton, of the merits of the legislation, and countering arguments of foreign governments who feared that the law would inhibit their citizens' ability to invest in Cuba.

Dubbin & Kravetz, LLP
1200 ANASTASIA AVENUE • SUITE 300 • CORAL GABLES, FLORIDA 33134 • TELEPHONE (305) 371-4700

make a shambles of the serious and hard-won bi-partisan consensus that resulted in the passage of the Helms-Burton Act.

As Congress's stated findings in the Helms-Burton Act explicitly provide, the purpose of the Helms-Burton Act was to compensate Americans whose property was confiscated by the Castro regime, recognizing the imperatives of international law, as well as to prevent businesses such as Carnival from profiting in the trafficking of American nationals' confiscated property, and prevent the Cuban government from using confiscated properties as collateral for foreign investment to replace the loss of Soviet subsidies in the 1990s. Today, approximately 85% of all certified claims are owned by individuals who inherited their claims from relatives whose property was confiscated by the Castro government prior to March 12, 1996. To accept the proposition that claims inherited after March 12,1996, are unenforceable would effectively render the law meaningless.

It would have made no sense for Congress to establish in the Helms-Burton Act such a compensatory and deterrent remedy in 1996 for confiscations that arose *two generations earlier*, which law *also* included the ability of the President to suspend the right to bring a lawsuit, and *then* say that Congress did not intend the remedy to be available to the *heirs* who inherited the claim 40+ years after the confiscation. Such a result would be completely incompatible with our purpose and our actions. The rights of heirs who inherited their claims, including after March 12, 1996, to bring a lawsuit on those claims is (as discussed below) embodied in the

DUBBIN & KRAVETZ, LLP
1200 ANASTASIA AVENUE • SUITE 300 • CORAL GABLES, FLORIDA 33134 • TELEPHONE (305) 371-4700

Title III framework and not negated by anything in the statutory language, including Section 6082(a)(4)(B).

In sum, the argument that the heirs who inherited their claims after March 12, 1996 cannot bring a lawsuit under Title III of the Helms-Burton Act is inconsistent with the Act and Congress's clearly expressed means and ends provided for in the law.

I.    **Title III's Text, Context, and History Authorize Heirs Who Inherited Their Claims After March 12, 1996, to File Lawsuits on Their Inherited Claims.**

This Court succinctly summarized the substantive provisions and legislative findings of the Helms-Burton Act in its August 26, 2019 Order Denying Carnival's Motion to Dismiss:

> On March 12, 1996, Congress passed the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996, 22 U.S.C.§§6021-6091, commonly referred to as the "Helms-Burton Act." In addition to strengthening international sanctions against the Cuban Government, under Helms-Burton, Congress sought to "protect United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro regime." 22 U.S.C. § 6022(6). According to Congress's findings, "'trafficking' in confiscated property provides badly needed financial benefit . . . to the Cuban Government and thus undermines the foreign policy of the United States," including "protect[ing] claims of United States nationals who had property wrongfully confiscated by the Cuban Government." *Id.*, § 6081(6)(B). "To deter trafficking," Congress found that "the victims of these confiscations should be endowed with a judicial remedy in the courts of the United States that would deny traffickers any profits from economically exploiting Castro's wrongful seizures." *Id.*, § 6081(11).
>
> To that end, Congress created a private right of action against any person who "traffics" in confiscated Cuban property. *See id.* § 6082(a)(1)(A); *id.* § 6023(13)(A) (defining "traffics"). Specifically, under Title III of the Act, "any person that . . . traffics in property which was confiscated by the Cuban Government on or after January 1, 1959,

4

shall be liable to any United States national who owns the claim to such property for money damages." *Id.* § 6082(a)(1)(A).

Order Denying Carnival's Motion to Dismiss, DE 41, at 1-2.

After the legislation passed, President Clinton allowed Title III to enter into force, but suspended the right to file suit pursuant to Section 306:

> I will allow Title III to come into force. As a result, all companies doing business in Cuba are hereby on notice that by trafficking in expropriated American property, they face the prospect of lawsuits and significant liability in the United States. This will serve as a deterrent to such trafficking, one of the central goals of the LIBERTAD Act.
>
> At the same time, I am suspending the right to file suit for 6 months. During that period, my administration will work to build support from the international community on a series of steps to promote democracy in Cuba. These steps include: increasing pressure on the regime to open up politically and economically, supporting forces for change on the island, withholding foreign assistance to Cuba, and promoting business practices that will help bring democracy to the Cuban workplace.

William Jefferson Clinton, *Statement on Action on Title III of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1995*, 1265 (1996) https://www.govinfo.gov/content/pkg/WCPD-1996-07-22/pdf/WCPD-1996-07-22-Pg1265.pdf (last visited February 24, 2020).

Every President since then had suspended the right to sue under Title III until April 17, 2019, when Secretary of State Mike Pompeo, exercising the authority delegated by President Trump, ended the 24-year succession of Presidential suspensions of the right to sue.

5

A.    **The Most Natural Interpretation of the Text of Title III is That Heirs Who Inherited Their Claims After March 12, 1996, Have the Right to Sue Under Title III.**

The overarching purpose of the Helms-Burton Act, clearly expressed, was to bring about democratic change in Cuba.  By suspending the right to sue, Congress gave the President leeway to attempt to seek such change.  Presidents William J. Clinton, George W. Bush, and Barak Obama suspended the right to sue throughout their terms.  President Trump continued the suspension during his first two years in office.[2]  With Secretary Pompeo's announcement in 2019, the administration would no longer suspend the right of action under Title III, it signified the United States' Government's conclusion that these efforts had reached an end, and that it was time for the remedy provisions of the law to be effectuated.  Congress did not intend for the remedy to be nullified when the time came that a President would no longer suspend the right to bring an action under Title III.  In fact, it would be completely antithetical to the entire statutory framework for the Court to hold that individuals who inherited their claims after March 12, 1996, would be unable to bring a claim for damages under Title III against a person or persons who trafficked in property that had been confiscated from their families as provided under the law.

The statutory text and context of the legislation, clearly stated in enacted legislative findings and the legislative record leading up to the passage of the law, support only one conclusion, that heirs who inherited their claims, including after

---

[2] The defense argument would result in the complete expiration and elimination of any claim where the claimant unfortunately died after March 12, 1996.  In effect, the suspension of the right to sue which was in place from March 12, 1996 to May 2, 2019 prevented claimants from initiating their lawsuits under Title III.

DUBBIN & KRAVETZ, LLP
1200 ANASTASIA AVENUE • SUITE 300 • CORAL GABLES, FLORIDA 33134 • TELEPHONE (305) 371-4700

March 12, 1996, are entitled to file lawsuits on those claims under Title III. *Nat'l Ass'n of Mfrs. v. Dept. of Def.*, 138 S. Ct. 617, 631 (2018) (in statutory interpretation, the "inquiry begins with the statutory text."); *U. of Tex. SW. Med. Ctr. v. Nassar*, 570 U.S. 338, 356 (2013) ("[t]ext may not be divorced from context.") Further, as the Supreme Court held last year in *Jam v. Int'l Finance Corp.*, 139 S. Ct. 759, 769 (2019), the court is charged with determining "the more natural reading" of the language used, which requires consideration and analysis of all of the provisions of the law. *Id.* at 769. And, to paraphrase the Court in *Jam*, "the language of [Title III] more naturally lends itself to the interpretation" that heirs who inherit their claims, including after March 12, 1996, are fully entitled to bring a lawsuit on those claims in this Court under Title III's litigation remedies.

**B.    The Enacted Legislative Findings Express Title III's Compensatory and Deterrent Purposes, Which Would Be Undermined If Heirs Who Inherited Their Claims After March 12, 1996, Are Deprived of Their Right to Bring a Lawsuit on Their Inherited Claim.**

There is nothing in the actual language of section 6082(a)(4)(B)[3] that precludes an heir to a claim that existed *before* March 12, 1996, from pursing that same claim under Title III *after* that date. The requirement in section 6082(a)(4)(B) that the U.S. national *acquire ownership* of the claim before March 12, 1996" does not apply to inheritances of a claim. That provision was specifically enacted to disallow the acquisition of claims by purchase or trade in a secondary market for

---

[3]    "A United States national may not bring an action under this section on a claim to the confiscated property unless such national acquires ownership of the claim before March 12, 1996." 22 U.S.C. § 6082(a)(4)(B).

DUBBIN & KRAVETZ, LLP
1200 ANASTASIA AVENUE • SUITE 300 • CORAL GABLES, FLORIDA 33134 • TELEPHONE (305) 371-4700

claims. This was made clear in the House Legislative Report, which confirms that both 6082(4)(B) and 6082(4)(C) were intended to eliminate any incentive that otherwise might exist to transfer claims to U.S. nationals to take advantage of the remedy created by this section:

> *Section 302(a)(4)(B)* states that, in the case of property confiscated before the date of enactment of this Act, the U.S. national had to have owned the claim to the property before the date of enactment in order to bring an action under this section. *Section 302(a)(4)(C)* states that in the case of property confiscated on or after the date of enactment, no U.S. national may bring an action under this section if he or she acquired the claim after the date of enactment. *These provisions are intended, in part, to eliminate any incentive that might otherwise exist to transfer claims to confiscated property to U.S. nationals in order to take advantage of the remedy created by this section.* Furthermore, it is not the intention of the committee that the right of action be available to entities that are incorporated in the United States after the date of enactment, inasmuch as such entities could not have owned the claim to confiscated property on the date of enactment because they did not then exist.

H.R. REP. 104-202(I), H.R. REP. 104-202(I) (1995), at 44 (emphasis supplied). Stated simply, Congress did not want to create a marketplace for the buying and selling of Title III claims. A claim inherited from a family member was never at issue.

Moreover, when juxtaposed with Congress's legislative findings and the published legislative record from the House and Senate hearings, reports, and floor statements, it is clear that barring these heirs from Title III's remedies would undermine Congress's clearly expressed purposes. Those purposes were and are: (1) to provide compensation for U.S. nationals whose property was confiscated by the Castro regime, in accordance with universally recognized principles of international

DUBBIN & KRAVETZ, LLP
1200 ANASTASIA AVENUE • SUITE 300 • CORAL GABLES, FLORIDA 33134 • TELEPHONE (305) 371-4700

law, human rights, and free, democratic societies, and (2) to deter trafficking in

confiscated property by businesses and individuals, and preventing the Communist

Cuban government from keeping itself afloat by using expropriated properties to

generate hard currency from foreign investors, who would be deterred from

investing in properties that could be subject to Title III's litigation remedies.[4]

---

[4]    *Amici* endorse this passage from a published article by Senator Helms' key
staffer for the Helms-Burton Act, Daniel W. Fisk, in "Cuba in US Policy: An
American Congressional Perspective," published in *Canada, the US, and Cuba:
Helms-Burton and its Aftermath*, Center for International Relations, Queens
University, Kingston, Ontario, Canada, 1999, at 31:

> The structure and implementation of foreign investment in
> Cuba has both a political and legal dimension: it supports the regime
> and ratifies the taking of property. The infrastructure that Castro
> offers consists of a number of properties taken from American citizens
> in violation of international law.
> This creates a "Cuba precedent" that undermines international
> law on property takings. If Castro's Cuba can nationalize and/or
> expropriate properties, deny the rightful owners any compensation or
> redress, and turn those same entities over to other private concerns
> which can operate against the interest of the rightful owner, then why
> cannot other nations do the same? Since international property
> settlements are based primarily on customary international law, which
> itself is based on State behavior, then European, Asian, Canadian, and
> Latin American acceptance of that situation raises the question as to
> whether Cuba's takings are acceptable behavior. The answer seems to
> be that, if the takings are at the expense of US citizens, then it is
> proper to trample on their rights. This situation was unacceptable to
> Senator Helms and the other authors of the LIBERTAD Act – the
> LIBERTAD Act was a clear rejection of an arguable evolution in
> international law legitimating the Castro regime's property takings or
> similar takings by other governments. . . .
> The objectives of the LIBERTAD Act, then, were to break the
> status quo through a proactive American policy to encourage the
> demise of Castro's repressive regime, to lay the foundation for
> American support for Cuba's democratic transition, and to encourage a
> modification in international property law that did not give the
> confiscating government the latitude being exercised by Castro.

DUBBIN & KRAVETZ, LLP
1200 ANASTASIA AVENUE • SUITE 300 • CORAL GABLES, FLORIDA 33134 • TELEPHONE (305) 371-4700

Congress's legislative findings explicitly set forth these principles in 22 U.S.C. Section 6081:

**§6081. Findings.**

The Congress makes the following findings:

**(1)** Individuals enjoy a fundamental right to own and enjoy property which is enshrined in the United States Constitution.

**(2)** The wrongful confiscation or taking of property belonging to United States nationals by the Cuban Government, and the subsequent exploitation of this property at the expense of the rightful owner, undermines the comity of nations, the free flow of commerce, and economic development.

**(3)** Since Fidel Castro seized power in Cuba in 1959—

**(A)** he has trampled on the fundamental rights of the Cuban people; and

**(B)** through his personal despotism, he has confiscated the property of—

**(i)** millions of his own citizens;

**(ii)** thousands of United States nationals; and

**(iii)** thousands more Cubans who claimed asylum in the United States as refugees because of persecution and later became naturalized citizens of the United States.

**(4)** It is in the interest of the Cuban people that the Cuban Government respect equally the property rights of Cuban nationals and nationals of other countries.

**(5)** The Cuban Government is offering foreign investors the opportunity to purchase an equity interest in, manage, or enter into joint ventures using property and assets some of which were confiscated from United States nationals.

DUBBIN & KRAVETZ, LLP
1200 ANASTASIA AVENUE • SUITE 300 • CORAL GABLES, FLORIDA 33134 • TELEPHONE (305) 371-4700

**(6)** This "trafficking" in confiscated property provides badly needed financial benefit, including hard currency, oil, and productive investment and expertise, to the current Cuban Government and thus undermines the foreign policy of the United States--

**(A)** to bring democratic institutions to Cuba through the pressure of a general economic embargo at a time when the Castro regime has proven to be vulnerable to international economic pressure; and
**(B)** to protect the claims of United States nationals who had property wrongfully confiscated by the Cuban Government.

**(7)** The United States Department of State has notified other governments that the transfer to third parties of properties confiscated by the Cuban Government "would complicate any attempt to return them to their original owners".

**(8)** The international judicial system, as currently structured, lacks fully effective remedies for the wrongful confiscation of property and for unjust enrichment from the use of wrongfully confiscated property by governments and private entities at the expense of the rightful owners of the property.

**(9)** International law recognizes that a nation has the ability to provide for rules of law with respect to conduct outside its territory that has or is intended to have substantial effect within its territory.

**(10)** The United States Government has an obligation to its citizens to provide protection against wrongful confiscations by foreign nations and their citizens, including the provision of private remedies.

**(11)** To deter trafficking in wrongfully confiscated property, United States nationals who were the victims of these confiscations should be endowed with a judicial remedy in the courts of the United States that would deny traffickers any profits from economically exploiting Castro's wrongful seizures.

As established by Section 6081, Congress's enacted findings and purposes in

Title III were to provide compensation to U.S. nationals whose property was

confiscated by Castro, and to deter potential foreign investors from providing the

Castro regime with hard currency via investments in real estate or acquisition of

DUBBIN & KRAVETZ, LLP
1200 ANASTASIA AVENUE • SUITE 300 • CORAL GABLES, FLORIDA 33134 • TELEPHONE (305) 371-4700

other assets.   The deterrent was the risk they would face by trafficking in confiscated property and thereby be subjected to a Title III claim by the rightful U.S. national owner.[5]   It would disserve the purposes of the law if *any* valid claims were arbitrarily discarded, including the substantial number of claims which are now owned by heirs who inherited their claims after March 12, 1996.

> ### C.   Context Provided by Legislative Reports Shows That Disallowing Lawsuits by Heirs Who Inherited Their Claim After March 12, 1996, Would Defeat the Entire Framework for Title III.

The proper context for applying Section 6082(a)(4)(B) is found in Congress's text, as shown above, as well as in the official legislative record.   A review of the sponsors' and supporters' statements throughout the legislative process confirm that Congress's main purposes were to provide compensation to U.S. national claimants whose property was confiscated by Castro in accordance with human rights and international law principles, and to deter foreign investment to provide Cuba with hard currency after the withdrawal of Soviet Union subsidies in the 1990s.   If the vast majority of eligible claims were excluded because they were

---

[5]    A third goal expressed in Legislative reports includes providing an avenue to compensate the claims of U.S. nationals whose property was confiscated from private parties which trafficked in their confiscated property, which would leave more public funds available for eventual property settlements from a future democratic Cuban government that would be required under international norms to compensate those whose properties were confiscated.   *See* H. REP. NO. 104-202(1), at 39 (1995) ("The recovery of damages under title III may also satisfy some certified claims, thereby reducing the number of claimants that will have to share in any negotiated lump-sum payment.").   Barring heirs who inherited their claim after March 12, 1996, from bringing a lawsuit under Title III on their inherited claims would also undermine that purpose of the law.

DUBBIN & KRAVETZ, LLP
1200 ANASTASIA AVENUE • SUITE 300 • CORAL GABLES, FLORIDA 33134 • TELEPHONE (305) 371-4700

inherited after March 12, 1996, the compensatory and deterrent purposes of the law would be substantially gutted.

While there is a very substantial legislative record for the Helms-Burton Act, the entries discussed below from that record confirm the compensatory and deterrent purposes of the law. Although the law was controversial, it was because some members of Congress disagreed with the approach that the legislative leaders and ultimately President Clinton adopted to bring about democratic change in Cuba. There is no dispute, however, that compensation to the claim holders and deterrence to the Castro regime from using confiscated property as collateral to fund his Communist enterprise after the loss of the Soviet Union's patronage in the 1990s were the major purposes of the law. This section will canvass some of the statements by key sponsors and proponents of the law in the House and Senate in 1995 and 1996.

During the debate in the House, Congressman Dan Burton, the lead House sponsor of the legislation, stated:

> What this does is it puts pressure on people who traffic in confiscated U.S. property by denying them visas, No. 1, and by providing a cause of action in U.S. courts for restitution if they buy confiscated U.S. property or traffic in it. That is what this does. So when I keep hearing my colleagues keep talking about this being an expansion of the embargo, all we are doing is saying that people who had their property confiscated have a right, a cause of action, and that people who deal in confiscated property should not be allowed to make a profit by coming to the United States.

DUBBIN & KRAVETZ, LLP

1200 ANASTASIA AVENUE • SUITE 300 • CORAL GABLES, FLORIDA 33134 • TELEPHONE (305) 371-4700

141 CONG. REC. H9349 (daily ed. Sept. 20, 1995) (statement of Rep. Burton), 141

CONG. REC. H9328-02, at *H9349, 1995 WL 556006.  Congressman Burton added,

the following day:

> All this bill does is say [Castro] cannot sell confiscated U.S.
> property. Our constituents had property down there that he took
> away from them that he is now selling to try to get hard currency to survive.
> All we want to do is give our constituents a way to get restitution from
> this government and deny him the hard currency he needs to survive
> as the Communist dictator, the last Communist dictator in our
> hemisphere.

141 CONG. REC. H9392 (daily ed. Sept. 21, 1995) (statement of Rep. Burton), 141

CONG. REC. H9368-05, at *H9392, 1995 WL 559215.

Congressman Robert Torricelli, supporting Congressman Burton, stated:

> Now, I ask the Members, as representatives of the American
> people, what is it we intend to do about it? What is it we are going to
> do? Is this the right of a foreign Nation, to take our property and then
> sell it wholesale? We have never allowed that to happen before. Is that
> some special privilege we will give to the Cuban government?  The bill
> of the gentleman from Indiana <Mr. BURTON> is an answer to the
> question. We will give the right to sue in an American court to a citizen
> who has lost their property, not because they should not have the right
> legitimately, appropriately, to take that suit to a Cuban court. That is
> the real answer, that is the right answer, but Castro will not let them
> in the court. If he would, we would not be here tonight.

141 CONG. REC. H9350 (daily ed. Sept. 20, 1995) (statement of Rep. Torricelli), 141

CONG. REC. H9328-02, at *H9350, 1995 WL 556006.

Senator Jesse Helms, the principal Senate sponsor of the Helms-Burton Act,

expressed his goals for the legislation in similar terms during the Senate debate in

October 1995:

> The most important element of this legislation is contained in
> title III. It creates a new right of action that allows U.S. nationals to

> sue those who are exploiting their confiscated property in Cuba. This provision is necessary to protect the rights of United States nationals whose property has been confiscated by the Cuban Government without just and adequate compensation—in fact, without any compensation. This new civil remedy will also discourage persons and companies from engaging in commercial transactions involving confiscated property, and in so doing deprive Cuba's Communist elite of the capital—the cash money—which they need to perpetuate their exploitation of the people of Cuba.

141 CONG. REC. S14998 (daily ed. Oct. 11, 1995) (statement of Sen. Helms).   He

added:

> What title III does, Mr. President, is protect the interests of U.S. nationals whose property was wrongfully confiscated by Fidel Castro and his henchmen. It does this by making persons or entities that knowingly and intentionally exploit stolen properties-United States properties, that is-in Cuba liable for damages in United States district court.   The intent, of course, is to deter third country nationals from seeking to profit from wrongfully confiscated properties-and to deny Fidel Castro what he needs most to survive: hard cash.   Title III specifically establishes the private civil right of action-that is, a right to sue in U.S. courts-for any U.S. national having ownership of a claim to commercial property confiscated by Castro against a person or entity who is knowingly benefiting from the use of such confiscated property. In other words, making profit off stolen goods. That is the simple term. The intent of this provision is to create a deterrence so that foreign investors do not unjustly benefit from American property confiscated by Fidel Castro and his henchmen.

141 CONG. REC. S15078 (daily ed. Oct. 12, 1995) (statement of Sen. Helms), 141

CONG. REC. S15077-02, at *S15078, 1995 WL 600607.

Congressman Robert Menendez, of New Jersey, a Cuban American who was

later elected to the U.S. Senate (and now serves as the Ranking Democrat on the

Senate Foreign Relations Committee), testified on May 22, 1995, before the Senate

Foreign Relations Western Hemisphere and Peace Corps Affairs Committee during

a hearing on "Strengthening Sanctions Against Cuba."   He was an original co-

DUBBIN & KRAVETZ, LLP
1200 ANASTASIA AVENUE • SUITE 300 • CORAL GABLES, FLORIDA 33134 • TELEPHONE (305) 371-4700

sponsor of the LIBERTAD Act.  He stated:  "It is appropriate to grant U.S. citizens who have had their property unlawfully confiscated and without compensation by the Castro regime the civil right of action because it protects the property rights of those American citizens."  *Strengthening Sanctions Against Cuba: Hearing on H.R. 927 Before the Subcomm. on W. Hemisphere and Peace Corps Affairs of the S. Foreign Relations Comm.,* 104th Cong. (1995).


Later that year, Congressman Menendez, stated:

> [T]he second part of the bill really deals with the right of American citizens and the right of American companies to be able to sue in our courts for their confiscated properties illegally confiscated in Cuba. If my colleagues want to stand up for American citizens, if my colleagues want to stand up for American companies simply to have a right to go to court and sue some foreign company that wants to buy those properties that were illegally confiscated from Cuba, my colleagues will support this bill. No matter how much hocus-pocus we have here, no matter how much clouding of the issue we want to make it, that is the basic line. Help the people in Cuba, blueprint for a transition, the ability to sue so that they can therefore make sure that their confiscated properties do not become the illegal fruits of Fidel Castro.

141 Cong. Rec. H9346 (daily ed. Sept. 20, 1995) (statement of Rep. Menendez), 141 Cong. Rec. H9328-02, at *H9346, 1995 WL 556006.  Congressman Burton agreed: "It is also in our interests because American citizens deserve the right, deserve the right, as was stated by the gentleman from New Jersey (Mr. MENENDEZ) a few moments ago, to sue to recover their stolen property. Our bill will give them that right." *Id.* at *H9338.

DUBBIN & KRAVETZ, LLP
1200 ANASTASIA AVENUE • SUITE 300 • CORAL GABLES, FLORIDA 33134 • TELEPHONE (305) 371-4700

Congressman Lincoln Diaz-Balart, of Miami, an original co-sponsor of the Act, advocated for passage of the measure:

> This bill will stop the flow, Mr. Speaker. This bill will stop the flow of foreign capital to Castro. His last lifeline after the collapse of the Soviet Union is creating a cause of action in United States courts for United States citizens against foreigners who traffic in property that Castro stole from those United States citizens. In other words, and I would like to quote the Speaker of the House on this: "If anyone else in the world buys expropriated American property from Castro and they have property here in the United States, we can then sue them in American courts to make them pay the money they just gave Castro for the property that was expropriated by Castro from American citizens."

141 CONG. REC. H9329 (daily ed. Sept. 20, 1995) (statement of Rep. Diaz-Balart), 141 CONG. REC. H9328-02, at *H9329, 1995 WL 556006.

Congresswoman Ileana Ros-Lehtinen, representing Miami, was also an original co-sponsor of the Helms-Burton Act. She also raised the need to deter foreign investors from being able to use confiscated properties to assist Castro financially in a hearing before the House International Relations Committee: "Ironically, Castro has turned toward foreign capitalists to salvage his failed communist regime. These unscrupulous investors are now heading to Cuba to make a quick profit . . . ." *Issues Facing Cuba: Hearing on H.R. 927 Before the W. Hemisphere Subcomm. of the H, Int'l Relations Comm.*, 104th Cong. (1995) (testimony of Rep. Ileana Ros-Lehtinen).

Congressman Peter Deutsch, representing parts of Miami-Dade and Broward Counties, was also an original co-sponsor. He added:

> Think about it. Just simple justice for Americans who might have owned property in Cuba, or Cubans who left Cuba and became

DUBBIN & KRAVETZ, LLP
1200 ANASTASIA AVENUE • SUITE 300 • CORAL GABLES, FLORIDA 33134 • TELEPHONE (305) 371-4700

> Americans, who are American citizens now. They owned a factory in Cuba, and they left because of the repressive regime. It could have been in the 50s or the 60s, it could have been in the 80s for that matter, and then a non-U.S. company bought that factory or bought that refinery that was illegally seized from the government that illegally took that factory and is making money off of that factory. Mr. Chairman, what this bill then says, it if is adopted into law, is that that U.S. citizen, or for that matter that U.S. company, has a right to seek justice, to seek compensation for what occurred.

141 CONG. REC. H9342 (daily ed. Sept. 20, 1995) (statement of Rep. Deutsch), 141

CONG. REC. H9328-02, at *H9342, 1995 WL 556006.

On September 20, 1995, Congressman Robert Livingston of Louisiana

commented:

> H.R. 927 permits American citizens to recover damages from foreign investors who are profiting from their stolen property in Cuba. This bill will block the foreign investment lifeline which still keeps Castro's regime alive and it will create a right for U.S. citizens to sue any individual or corporation which knowingly and intentionally traffics in confiscated property of U.S. nationals.

141 CONG. REC. H9341 (daily ed. Sept. 20, 1995) (statement of Rep. Livingston), 141

CONG. REC. H9328-02, at *H9341, 1995 WL 556006.

Senator Paul Coverdell, of Georgia, stated:

> Mr. President, the Libertad conference report, as I said, provides a way for American citizens whose property was stolen by Fidel Castro to protect their claim or receive compensation from those who knowingly and intentionally exploit that property and are in the United States under the jurisdiction of U.S. courts.

141 CONG. REC. S1480 (daily ed. Mar. 5, 1996) (statement of Sen. Coverdell), 141

CONG. REC. S1479-04, at *S1480, 1996 WL 92885.  He added: "I hope that we give

comfort to those who have had their lifelong possessions confiscated by the Cuban

Government, that we will begin to signal hope to them, that there may be light at

the end of the tunnel, and that they will be compensated for that which was lost."

*Id.* at *S1506.

> Senator Olympia Snowe, of Maine, agreed:
>
> The purpose of this bill, among other things, is to deter these kind of actions by foreign companies who may be tempted to invest in Castro's Cuba at the expense of uncompensated Americans...This bill accomplishes that in two ways...In title III, the bill permits American citizens to bring suit against foreign persons who traffic in their confiscated property in Cuba. To obtain the administration's support for this bill, in conference we granted the President renewable 6-month waiver authority. But this still achieves the main goal of this title by creating an environment of uncertainty that foreign firms will want to avoid.

*Id.* at *S1497.

> Finally, the House Report on H.R. 927 stated:
>
> Title III and IV seek to protect the interests of U.S nationals whose property has been confiscated illegally by making persons or companies that knowingly and intentionally traffic in confiscated property of U.S nationals in Cuba (beginning six months after the date of enactment) liable for damages in U.S. District Court (title III), and by excluding from entry into the United States any person who traffics in confiscated property of U.S. nationals (title IV). These provisions are intended primarily to create a 'chilling effect' that will deny the current Cuban regime venture capital, discourage third-country nationals from seeking to profit from illegally confiscated property, and help preserve such property until such time as the rightful owners can successfully assert their claim.

H. REP. NO. 104-202(1), at 25 (1995). The Report added:

> Title III creates a new right of action in the U.S. district court for United States nationals whose confiscated property is being exploited in Cuba. The purpose of this new civil remedy is, in part, to discourage persons and companies from engaging in commercial transactions involving confiscated property, and in so doing to deny the Cuban regime the capital generated by such ventures and deter the exploitation of property confiscated from U.S. nationals. This right of action is unique but proportionate remedy for U.S. nationals who were

DUBBIN & KRAVETZ, LLP
1200 ANASTASIA AVENUE • SUITE 300 • CORAL GABLES, FLORIDA 33134 • TELEPHONE (305) 371-4700

targeted by the Castro regime when their property was confiscated in violation of both Cuban law and international law.

*Id.* at 39.

In sum, the legislative record, as well as the resulting statutory language and substantial post-enactment history, make it clear that Congress intended for individuals (and entities) with certified claims and non-certified claims on property confiscated by the Cuban government to have recourse in the U.S. courts under Title III to obtain compensation under the well-defined parameters of the statute. Adopting the traffickers' argument to deny heirs who inherited their claims to bring a lawsuit pursuant to Title III, just because their relatives died after March 12, 1996, and they did not inherit their claims until after that date, would repudiate what Congress painstakingly enacted in 1996. *Amici* urge this Court not to undo Congress's proper exercise of its legislative authority in the Helms-Burton Act.

## III.   Conclusion.

As Members of Congress who were instrumental in drafting and passing the Helms-Burton Act, we advise the Court that it was never Congress's intention to deprive those U.S. nationals who inherited their claim after March 12, 1996, from filing a lawsuit on their claim pursuant to Title III. *Amici* urge this Court to reject the defense argument that heirs are not entitled to bring a lawsuit on their claim under Title III if they inherited their claim after March 12, 1996.

DUBBIN & KRAVETZ, LLP

1200 ANASTASIA AVENUE • SUITE 300 • CORAL GABLES, FLORIDA 33134 • TELEPHONE (305) 371-4700

Dated:  February 24, 2020

Respectfully submitted,


DUBBIN & KRAVETZ, LLP
Samuel J. Dubbin, P.A.
1200 Anastasia Avenue, Suite 300
Coral Gables, Florida 33134
Telephone: (305) 357-9004
Email:  sdubbin@dubbinkravetz.com

By: _____
Samuel J. Dubbin, P.A.
Fla. Bar No. 328189

Attorneys for *Amici Curiae* Dan
Burton and Robert Torricelli


## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2020, I filed the foregoing document

with the CM/ECF system which will serve all counsel of record in this case.


By: _____
Samuel J. Dubbin, P.A.

DUBBIN & KRAVETZ, LLP
1200 ANASTASIA AVENUE • SUITE 300 • CORAL GABLES, FLORIDA 33134 • TELEPHONE (305) 371-4700